**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| VALERIE DAVIS,           )<br>                                  )<br>     Plaintiff,            )<br>                                  )<br>v.                                )   CIVIL ACTION NO.<br>                                  )   06-0452-BH-B<br>LIBERTY MUTUAL INSURANCE  )<br>COMPANY, et al.,          )<br>                                  )<br>     Defendant.           ) | |

**FINDINGS OF FACT; CONCLUSIONS OF LAW
AND ORDER**

This action is before the Court on defendant's motion for summary judgment (Doc. 18). Upon consideration of the motion, plaintiff's response in opposition thereto (Doc. 22), defendant's reply (Doc. 23), and all other pertinent portions of the record, the Court concludes that the motion is due to be granted.

**FINDINGS OF FACT**

Upon consideration of all the evidence of record, both testimonial and documentary, the Court finds that the following facts are either undisputed or uncontradicted by the plaintiff:

1.  Valerie Davis ("Davis"), the plaintiff, was terribly injured in 1995 while working at Gulf States Paper when a machine fell on her dominant right hand. She required amputation of her thumb and forefinger with grafts. This injury was covered under the worker's compensation laws of the State of Alabama.

2. Davis's workmen's compensation indemnity claim was settled in 1996 for $32,050.00 with medicals left open for life. Liberty Mutual Insurance Company ("Liberty Mutual"), the defendant, is the insurance carrier responsible for the medical treatment benefits that arise out of Davis's injury.

3. Davis filed this lawsuit on July 11, 2006, in the Circuit Court of Marengo County, Alabama, alleging that Liberty Mutual "acted in bad faith and outrageous conduct in [its] refusal and failure to provide and pay for reasonable and necessary medical treatment for Plaintiff." (Complaint at ¶ 2.) Davis further alleges that Liberty Mutual "refused to provide and pay for detailed psychiatric evaluation, testing, and treatment that Plaintiff is entitled to and requires." (*Id.*) Liberty Mutual removed this action to this Court on August 2, 2006.

4. Liberty Mutual has, however, proffered evidence establishing that it has provided extensive care and treatment for Davis including several surgeries, six weeks of rehabilitation in Boston, Massachusetts, additional rehabilitation in Jackson, Mississippi, an attempt at providing a prosthesis, years of treatment by psychologist Dr. Kenneth Schneider (usually once and sometimes twice per week), and numerous pain and psychotropic medications.

5. Liberty Mutual did stop paying for some of Davis's pain and psychotropic medications in April 2004. Liberty Mutual continued to pay for Davis's once-to-twice weekly visits to Dr. Schneider and for mileage for such visits. Davis does not dispute, or even discuss, the fact that the reason Liberty Mutual stopped paying for these medications

was because it discovered that Davis's personal physician, Dr. Judy Cooke Travis, was billing Davis's office visits to Medicare but the prescriptions to Liberty Mutual.  Davis acknowledges that Liberty Mutual requested Dr. Travis to provide an explanation as to why office visit were being billed to Medicare while prescriptions were being billed to workers' compensation, and for an explanation as to how the prescribed medications related to the on-the-job injury suffered by Davis.  Although Davis disputes Liberty Mutual's contention that no explanation was ever given by Dr. Travis, Davis does so by relying upon two letters sent by Dr. Travis.  The first of these letters, dated April 13, 2004, is addressed "To Whom It May Concern" and merely describes Davis's medical history relative to the injury as the predicate to her conclusion that Davis "is about 237% disabled."  (Pl. Exh. 10.)  The second letter, dated August 10, 2004, was addressed to Liberty Mutual but on its face neither discussed the reason that Dr. Travis was billing office visits to Medicare and prescriptions to Liberty Mutual nor presented any specific explanation regarding the drugs being prescribed for Davis.[1]  (Pl. Exh. 9.)  Consequently, Davis's reliance on these letters is misguided.

      6.      In addition, Davis does not dispute that since the retirement of her approved pain management treating physician, Dr. Alan E. Freeland, Liberty Mutual has, pursuant to the Alabama Workers' Compensation Act, provided Davis with a list of five (5) pain

---

[1] Dr. Travis merely lists the prescribed drugs and generally states "[a]ll of the medications are coordinated to provide adequate pain management and control of correlated psychiatric symptoms of anxiety and depression [and] [s]uch a regime involving the combination of opiates is well documented in chronic pain syndromes stemming from profound tissue damage such as Ms. Davis' case." (Pl. Exh. 9.)

management doctors for her to choose from, the fifth one from Tuscaloosa was added at her request, but she has refused to choose an authorized treating doctor.  It was only after Dr. Freeland's retirement that Dr. Travis began prescribing Davis's medications and the question regarding relatedness of some of the medications arose because Dr. Travis was billing Davis's office visits to Medicare but the medications to Liberty Mutual, a question never answered either by Dr. Travis at any time or by Davis in response to this motion for summary judgment.[2]

      7.     Because of the above disputes, Liberty Mutual requested medical dispute resolution through the Alabama Department of Industrial Relations pursuant to Alabama Code § 25-5-77(l)(5).[3]  The Alabama Department of Industrial Relations recommended that Davis be provided a psychiatric evaluation and that a panel of pain management doctors be provided to Davis for her selection of one.  As noted above, Liberty Mutual has complied with both these recommendations but to no avail.

---

[2] Davis complains that the Alabama Department of Industrial Relations declared on July 22, 2005, "that Dr. Travis is not an approved treating physician" even though Liberty Mutual's internal files "show that Dr. Travis was recognized as an authorized treating physician as early as 2002."  (Opposition Brief at 7; Pl. Exh. 2 and 21.)  Davis has proffered no evidence, however, that the 2002 decision regarding whether Dr. Travis was an "approved treating physician" was sanctioned by the Alabama Department of Industrial Relations or that Dr. Travis's treatment role was the same in 2005.  In contrast, the evidence establishes that Dr. Travis's role in prescribing medication changed upon the retirement of Dr. Freeland when Dr. Travis assumed the responsibility of prescribing all Davis's medications.

[3] The evidence of record establishes that Liberty Mutual only sought medical dispute resolution through the Alabama Department of Industrial Relations pursuant to Ala. Code. § 25-5-77(l)(5) when its efforts to resolve the dispute by communicating with Davis's doctors and by obtaining an independent medical examination as provided by Alabama law failed.

8. Davis has not only failed to dispute Liberty Mutual's assertion that it has attempted to have Davis evaluated by Dr. Charles Ford, a psychiatrist at the University of Alabama neuropsychiatry clinic and that she has refused to see Dr. Ford, but to even address the issue in her opposition to summary judgment. Thus Davis has even ignored her own Exhibit 21, the Alabama Department of Industrial Relations report of July 22, 2005, to the extent it establishes the importance of the psychiatric evaluation by Dr. Ford:

> We consulted with one of our independent medical experts, a Board Certified Psychiatrist, and his opinion is as follows:
>
> "I do want to point out that the data included in [Dr. Schneider's] file goes back no further than the year 2000 . . . it is indicated that Dr. Schneider has been seeing Ms. Davis 1-2 times a week since 2000 . . . . My comments in this letter are drawn upon my experience as a psychiatrist over many years, and I say this because I cannot specifically address whether the psychotherapy provided by Dr. Schneider is appropriate and medically necessary. I have no information in the file of a complete psychiatric/psychological work-up to help me understand this patient's past personal and family history or her developmental history as far as personality disorder features are concerned. It does seem that after all this time, Ms. Davis could be seen on a less frequent basis for more of what we call "supportive psychotherapy."
>
> "As to whether the current diagnosis is correct, I feel that I do not have a complete psychiatric/psychological picture to say what the original diagnosis was. It appears that Ms. Davis' therapist and general practitioner apparently feel that she is suffering with a major depressive disorder, chronic pain syndrome and social anxiety disorder. This stems from the injury and subsequent disfigurement of her hand. At the risk of sounding repetitive, again, I agree with Dr. Ford in paragraph 3 of his letter concerning his observation that *there should be a complete medical history, a developmental history, a family history, a past psychiatric history, a history of any prior substance abuse, and a detailed mental status examination*."

> Our consultant goes on to state that he needs more information in order to determine whether this patient has "long standing personality issues and relationship conflicts." He also needs more information from current psychiatric evaluation and psychological testing to decide whether or not Ms. Davis has any "long standing personality problems."
>
> He further states "it seems reasonable to say that Ms. Davis should be re-evaluated at a pain clinic. She should be carefully followed by a competent medical person (a psychiatrist in my opinion) to see that she is on necessary medication but that medications which are habit forming or addictive be avoided if at all possible. I am sorry that I cannot answer the questions you ask with more certainty. The whole picture needs to be restudied in my opinion and I would very much like to see earlier records to indicate what Ms. Davis' status was prior to her injury as far as psychiatric or psychological issues are concerned."

(Pl. Exh. 21 at 1-2.) With specific reference to Dr. Ford's opinion, the Alabama Department of Industrial Relations stated:

> We note that this employee was to have been evaluated by Dr. Charles V. Ford, neuro-psychiatrist at the request of the employer. Dr. Ford is with the Department of Psychiatry and Behavioral Neurobiology at the University of Alabama School of Medicine, Birmingham, Alabama. He advises that she did not keep the appointment, however, he did review the record and his report is in the file. We point this out since it is our independent medical expert's opinion that this patient should be evaluated and diagnosed by a psychiatrist.

(*Id*. at 2-3.) The letter actually written by Dr. Ford sets forth all of the medications prescribed by Dr. Travis and comments on them in outline form as follows:

> a.   There are several acetaminophen-containing compounds and the total received by the patient per day may well be in the hepatotoxic range. I would strongly suggest that the total amount of acetaminophen prescribed be sharply reduced.

      b.      There are two non-steroidal drugs Daypro and Celebrex being prescribed.  The Celebrex is an inhibitor of the CYP2D6 enzyme system, which is involved in the metabolism of both the Ultram (tramodol) as well as the hydrocodone.  Propoxyphene is also an inhibitor of the CYP2D6 enzyme.  Thus, I would recommend that the Celebrex be discontinued.  The dosage of diazepam at 15-mg t.i.d. is excessive and should be reduced to no more than 5-mg t.i.d. and/or preferably changed to donazepam at a dosage of approximately 0.5-mg to 1-mg b.i.d if it is considered necessary for anxiety control.

      c.      The propoxyphene in the Darvocet N has been associated with increasing depression and thus this is a drug that I would discontinue.  Because it also contains the acetaminophen this is one way to also reduce the acetaminophen.

(Prevost Aff. at Exh. A.)

9.     In addition to the medical dispute resolution attempted through the Alabama Department of Industrial Relations pursuant to Ala. Code § 25-5-77(l)(5), Liberty Mutual also filed, pursuant to Ala. Code § 25-5-77(i)(4), a declaratory judgment action in the Circuit Court of Marengo County, Alabama (CV 02-104), asking the Court to resolve the dispute.  Judge Hardaway of that Court entered an Order on September 27, 2006, granting Liberty Mutual's motion to compel Davis to select a doctor from the provided panel and to submit to an independent medical exam.  Although Davis argues that Liberty Mutual "engaged in other furtive conduct . . . to go around its obligation to provide medical care" by obtaining an Order from the Circuit Court "to compel IME with no notice to her attorney" (Opposition Brief at 7), Davis has proffered no evidence that Liberty Mutual was responsible for the alleged lack of notice to her counsel or that she was in fact entitled to object to the IME at issue, particularly under the circumstances as set forth

above.  The Marengo County Circuit Court case had been pending for four years in which Davis's counsel had actively participated.

10.     Although not even mentioned by Liberty Mutual, Davis acknowledges that Liberty Mutual "was contacted by an ex-boyfriend of the Plaintiff, who stated that she was not disabled and, was actually cleaning Dr. Schneider's house for pay." (Opposition Brief at 7, *citing* Pl. Exh. 22.)  Davis further states that "[t]here is no indication in the file that Liberty Mutual followed up on this claim from a jilted boyfriend by contacting either the Plaintiff or Dr. Schneider to look into this allegation." (*Id.*)  The subject notation in Liberty Mutual's file is dated March 29, 2004.  While it might be inferred that this report from an ex-boyfriend led to Liberty Mutual's close examination of Davis's medical treatment regime, Davis has failed to proffer any evidence that the veracity of this report by the ex-boyfriend, as opposed to the close examination of Davis's treatment, has anything to do with the questions which have arisen concerning the appropriateness of Davis's treatment and the medications being prescribed by Dr. Travis.  Nor does it refute in any manner the fact that Davis has failed to submit to an independent medical examination by a board certified psychiatrist or to select a pain management treating physician from the panel of qualified approved physicians presented to her, including one that she specifically requested to be included.

11.     No evidence has been proffered that Liberty Mutual ever tried to pressure Davis into any settlement.  Davis testified that Liberty Mutual never approached her about settling her future medical benefits.  Although Davis has proffered certain claim

notes that make reference to the possibility of evaluating this claim for "possible settlement" of future medical benefits, there is no evidence that this was ever done. To the contrary, there were numerous comments in the claim notes, including ones proffered by Davis, in regard to adjusting the reserves on the file in order to more accurately reflect the future payments for Davis's medical treatment.

## CONCLUSIONS OF LAW

In this action, Davis alleges claims of bad faith and outrageous conduct. However, Davis does not, and cannot, challenge the propriety of summary judgment in Liberty Mutual's favor on her bad faith claim. The Alabama Supreme Court has held in a number of cases that bad faith claims are barred by the exclusivity of remedy provisions in the Alabama Workers' Compensation Act. *See e.g.*, *Hobbs v. Alabama Power Co.*, 775 So.2d 783, 787 (Ala. 2000)("[C]laims that the employer acted in bad faith in denying worker's compensation benefits to its employee are barred by the exclusivity of remedy provisions of the Alabama Worker's Compensation Laws.") *citing*, *Wooley v. Shewbart*, 569 So.2d 712 (Ala.1990); *Nabors v. St. Paul Insurance Co.*, 489 So.2d 573 (Ala.1986); *Garvin v. Shewbart*, 442 So.2d 80 (Ala.1983).

The Court agrees that the Alabama Supreme Court has allowed the tort of outrage to proceed in the workers' compensation setting, but only in very limited, fact specific situations. In order to establish a claim for outrage, a plaintiff must prove: (1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be

expected to endure it. *Soti v. Lowe's Home Centers, Inc.*, 906 So.2d 916, 919 (Ala. 2005). *See also*, *American Road Service Co. V. Inmon*, 394 So.2d 361, 365 (Ala. 1980) (A plaintiff must demonstrate that the defendant engaged in "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.")

The *Inmon* test is to be applied strictly, "thereby allowing an outrage claim to go to the jury only in egregious cases." *Ex parte Crawford & Co.*, 693 So.2d 458, 459-60 (Ala. 1997), *citing*, *State Farm Automobile Insurance Co. v. Morris*, 612 So.2d 440 (Ala.1993); *Gibson v. Southern Guaranty Insurance Co.*, 623 So.2d 1065 (Ala.1993); *Gibbs v. Aetna Casualty & Surety Co.*, 604 So.2d 414 (Ala.1992); *Farley v. CNA Insurance Co.*, 576 So.2d 158 (Ala.1991); *Empiregas, Inc., of Gadsden v. Geary*, 431 So.2d 1258 (Ala.1983). "In order to create a jury question on the tort of outrage, there must exist 'sufficient evidence from which permissible inferences could be drawn to support a finding of the extreme conduct necessary to constitute outrageous conduct'." *Ex parte Crawford*, 693 So.2d at 459, *quoting*, *Empiregas, Inc.*, 431 So.2d at 1261.

As applied to the case at bar, the Court concludes that Davis has failed to meet her burden to establish that Liberty Mutual's conduct was either extreme or outrageous. The conduct in this case is far from the degree of conduct upheld as outrageous by the Alabama Supreme Court in only two cases over the years, namely *Continental Casualty Insurance Co. V. McDonald*, 567 So.2d 1208 (Ala. 1990) and *Travelers Indemnity Co. Of Illinois v. Griner*, 809 So.2d 808 (Ala. 2001).

In *McDonald*, the Alabama Supreme Court recited numerous delays and denials of treatment extending over several years, almost all without any justification or attempt by the insurance carrier to properly respond to or resolve the issues. The Court further cited the fact that the insurance carrier documented that it expected the claimant's medical bills to total from $71,000 to $115,000, yet only offered the claimant $1,000 per year (at a cost of $9,096 for an annuity) to settle.

In *Griner*, the Alabama Supreme Court also outlined delays and denials of treatment lasting for years. The Court further cited the fact that the insurance carrier documented an anticipated total of $279,400 for the claimant's benefits over his lifetime but offered only $5,000 to settle his future medicals. The Court also noted that, in response to Griner's counter-demand for $80,000 to settle, the insurance carrier wrote in Griner's file: "I simply chuckled and stated we're not interested in anything near that." *Griner*, 809 So.2d at 812.

In this case, there is absolutely no evidence that Liberty Mutual ever tried to pressure Davis into any settlement, much less a low-ball settlement. Davis testified that Liberty Mutual never approached her about settling her future medical benefits. Although Davis has proffered certain claim notes that make reference to the possibility of evaluating this claim for "possible settlement" of future medical benefits, there is no evidence that this was ever done. To the contrary, there were numerous comments in the claim notes, including ones proffered by Davis, in regard to adjusting the reserves on the file in order to more accurately reflect the future payments for Davis's medical treatment.

11

In contrast to *Griner* and *McDonald*, the facts of this case are more similar to *Soti v. Lowe's Home Centers, Inc.*, 906 So.2d 916 (Ala. 2005).  In *Soti*, as here, the defendant provided extensive and continuing medical treatment for the plaintiff for years.  In *Soti*, the Alabama Supreme Court held that, unlike *McDonald* and *Griner* where the defendants engaged in a pattern of delay and denial of numerous benefits to the claimants for over five years, the insurance carrier "provided extensive and continuing medical treatment for Soti for three years, including three back surgeries [and] [t]he only dispute over benefits arose over [an apparently unrelated need for] hernia surgery."  In *Soti*, the Court also held that, unlike *McDonald* and *Griner*, "there is no evidence indicating that [the insurance carrier] was attempting to use Soti's condition to pressure Soti to agree to a more favorable settlement."

In this case, the Court agrees that, rather than engaging in outrageous conduct, Liberty Mutual made numerous attempts, all pursuant to the Alabama Worker's Compensation Act, to resolve the dispute as to <u>some</u> of Davis's medical treatment while continuing to pay for significant portions of that treatment.  These attempts have included attempts to get an independent medical exam warranted by legitimate questions raised by medical experts who examined the medical records provided by Davis, attempts to get Davis to choose a replacement pain medicine specialist, submission of the dispute to the Alabama Department of Industrial Relations, and attempts to get the dispute resolved by the Circuit Court of Marengo County, Alabama.  There have been no attempts to coerce

Davis into any settlement of her future medical benefits. Liberty Mutual is clearly entitled to summary judgment in its favor on the outrage claim.

Davis's reliance on cases such as *City of Auburn v. Brown*, 638 So.2d 1339, 1341 (Ala.Civ.App. 1993)("[T]he employer may not dictate to the employee that he may not have the medical treatment recommended by his authorized, treating physicians."), is misguided. Unlike *Brown,* the Alabama Department of Industrial Relations concluded that Dr. Travis was not an authorized treating physician with regard to the pain and psychotrophic prescriptions she began writing for Davis after Dr. Freeland retired. In addition, neither Liberty Mutual nor Davis's employer were dictating any sort of treatment or even dictating that Dr. Travis no longer provide any kind of treatment to Davis but, instead, were merely seeking the independent medical examination which was not questioned in *Brown.* The legitimate questions in this case concerning the appropriateness of the pain and psychotrophic medications being prescribed by Dr. Travis, a general practitioner, constituted sufficient grounds for the sought after examination of Davis by Dr. Ford, a specialist in nueropsychiatry.

Similarly, *Waffle House, Inc. V. Howard*, 794 So.2d 1123, 1130 (Ala.Civ.App. 2000)("[W]hen an employer authorizes treatment for an employee by one physician and the employee is satisfied with the treatment provided by that physician, the employer loses its authority to withdraw its authorization for treatment by that physician."), is distinguishable from the case at bar. Unlike *Howard*, there is no evidence in this case that Dr. Travis, a general practitioner, was authorized to prescribe the pain and psychotrophic

medications she began to prescribe when Dr. Freeland retired.  Nor was there ever an attempt to exclude Dr. Travis from otherwise treating Davis.  As stated above, the legitimate questions in this case concerning the appropriateness of the pain and psychotrophic medications being prescribed by Dr. Travis, a general practitioner, constituted sufficient grounds for the sought after examination of Davis by Dr. Ford, a specialist in nueropsychiatry.  In addition, there is ample evidence that Liberty Mutual was attempting to provide appropriate substitute expert medical pain management treatment when Dr. Freeland retired by requesting that Davis select from a panel of five such experts, including one added at plaintiff request.  Liberty Mutual was not denying Davis any appropriate treatment but, instead, offering to guarantee such treatment.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that there exists no material issue of fact and that Liberty Mutual is entitled to judgment as a matter of law.  It is therefore **ORDERED** that Liberty Mutual's motion for summary judgment be and is hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendant, Liberty Mutual Insurance Company, and against the plaintiff, Valerie Davis, the plaintiff to have and recover nothing of the defendant for either bad faith or outrage.  Costs are taxed against the plaintiff.

**DONE** this 9th day of July, 2007.

s/ W. B. Hand<br>SENIOR DISTRICT JUDGE